# Exhibit 2

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                     ATLANTA DIVISION
3
4    CHRYSHON HOLLINS,            )
                                  )
5         Plaintiff,              )
                                  )
6      vs.                        )  CIVIL ACTION FILE
                                  )  NO. 1:23-CV-05890-VMC
7    SHERIFF VICTOR HILL,         )
     KENDRIX BURNS, ANTHONY       )
8    WASHINGTON, TABATHA          )
     GIVENS, AND JERVARIOUS       )
9    HARGROVE, in their           )
     individual capacities,       )
10                                )
           Defendants.            )
11
12
13
14
15           VIDEOTAPED DEPOSITION OF
16              JERVARIOUS HARGROVE
17               October 21, 2024
18                 11:39 a.m.
19
20           100 Galleria Parkway
                Suite 1600
             Atlanta, Georgia
21
22      Lamarra George, RPR, CCR-2582
23
24
25

Case 1:23-cv-05890-VMC   Document 122-4   Filed 09/19/25   Page 3 of 20
Jervarious Hargrove                                        October 21, 2024
Hollins, Chryshon v. Hill, Sheriff, Victor

Page 17

1    Clayton County when I was 19.
2         Q.   Got you.  And you received your degree
3    from that high school?
4         A.   Yes, sir.
5         Q.   And you didn't have any prior work
6    experience before joining the Clayton County
7    Sheriff's Office?
8         A.   Yes, sir.  McDonald's.
9         Q.   Any other work experience?
10        A.   It's called Get Air Trampoline Park.
11        Q.   And I'm sorry.  So you worked at Get Air
12   Trampoline Park?
13        A.   Yes.
14        Q.   So no law enforcement experience prior to
15   joining Clayton County Sheriff's Office?
16        A.   No.
17        Q.   And when did you start at CCSO?
18        A.   2019.
19        Q.   Do you recall the month?
20        A.   No.
21        Q.   And what was your position when you
22   started?
23        A.   Correctional officer.
24        Q.   That was your title?
25        A.   Yes.

Case 1:23-cv-05890-VMC   Document 122-4   Filed 09/19/25   Page 4 of 20
Jervarious Hargrove                                        October 21, 2024
Hollins, Chryshon v. Hill, Sheriff, Victor

Page 18

1        Q.    Did you get promoted or did that title
2    change at any point in time?
3        A.    Yes.
4        Q.    What did it change to?
5        A.    SRT.
6        Q.    And what does SRT stand for?
7        A.    Scorpion Response Team.
8        Q.    And what is the Scorpion Response Team?
9        A.    It's a response team that responds to
10   major violence in the jail.
11       Q.    And what do you mean by "major violence"?
12   What are you referring to there?
13       A.    People fighting or officer-involved fight
14   with an inmate or inmates fighting each other.
15   Things of that nature.
16       Q.    And aside from joining the SRT, any other
17   changes in your position from when you started as a
18   correctional officer?
19       A.    No.
20       Q.    Let's break those down -- those each down
21   for a moment.  What were your role -- what was your
22   responsibilities as a correctional officer?
23       A.    To make sure all inmates are safe and out
24   of danger.
25       Q.    That was your primary role?

Case 1:23-cv-05890-VMC   Document 122-4   Filed 09/19/25   Page 5 of 20
Jervarious Hargrove                                October 21, 2024
Hollins, Chryshon v. Hill, Sheriff, Victor

Page 28

1  Q. Was it more than a dozen?
2  A. I don't remember.
3  Q. It was more than one?
4  A. Yes.
5  Q. Do you recall how often in any given month
6  the restraint chair was used?
7  A. No.
8  Q. In any given month, how often did you see
9  it used?
10 A. I don't remember.
11 Q. Did you place individuals in the restraint
12 chair?
13 A. Yes.
14 Q. How many?
15 A. I don't remember.
16 Q. Was it more than one?
17 A. Yes.
18 Q. More than a dozen?
19 A. I don't remember.
20 Q. How long would individuals typically be
21 placed in the chair?
22 A. Four hours.
23 Q. Was that a maximum or a minimum?
24 A. Minimum.
25 Q. So if the chair was used, it would be

| | | | |
|---|---|---|---|
| 1 | | | imposed for a minimum of four hours? |
| 2 | | A. | Yes. |
| 3 | | Q. | And so that time could -- it'd be |
| 4 | extended? | | |
| 5 | | A. | No. |
| 6 | | Q. | It would never be extended? |
| 7 | | A. | No. |
| 8 | | Q. | Did the amount of time ever change? |
| 9 | | A. | No. |
| 10 | | Q. | It was always four hours exactly? |
| 11 | | A. | Yes. |
| 12 | | Q. | Each time you saw it used? |
| 13 | | A. | Yes. |
| 14 | | Q. | Every time you used it? |
| 15 | | A. | Yes. |
| 16 | | Q. | It's always four hours? |
| 17 | | A. | Yes. |
| 18 | | Q. | No less? |
| 19 | | A. | No. |
| 20 | | Q. | How did you determine the amount of time |
| 21 | was four hours? | | |
| 22 | | A. | By logs. |
| 23 | | Q. | So it's your understanding that the logs |
| 24 | would be used to ensure that it was four hours | | |
| 25 | exactly? | | |

1      A.    No.
2      Q.    Do you recall meeting Mr. Hollins at any
3   time?
4      A.    Yes.
5      Q.    Do you know what date that was?
6      A.    No.
7      Q.    Did you meet him once or more than once?
8      A.    I don't remember.
9      Q.    What do you remember from meeting him?
10     A.    Not a lot.  It was a long time ago.
11     Q.    Sure.  But what do you remember?
12     A.    That he got in a restraint chair.
13     Q.    That you placed him in a restraint chair?
14     A.    Yes.
15     Q.    You recall him placing him in a restraint
16  chair, right?
17     A.    Yes.
18     Q.    Do you recall any other details besides
19  placing Mr. Hollins in the restraint chair?
20     A.    No.
21     Q.    Do you recall having any discussions with
22  any officers or employees of the Clayton County
23  Sheriff's Office regarding Mr. Hollins?
24     A.    No.
25     Q.    Do you recall any other details regarding

```
 1        Q.    There was a risk of that?
 2        A.    Yes.
 3        Q.    Any other risks?
 4        A.    I don't remember.
 5        Q.    But that's the -- those are the ones that
 6   you can think of sitting here today?
 7        A.    Yes.
 8        Q.    Now we talked about you first meeting
 9   Mr. Hollins and putting him in the restraint chair,
10   right?
11        A.    Yes.
12        Q.    You don't recall where in the jail you
13   first met him?
14        A.    No.
15        Q.    Any other conversations with him at all?
16        A.    No.
17        Q.    You don't remember when you met him?
18        A.    No.
19        Q.    When you encountered Mr. Hollins, he
20   wasn't being violent?
21        A.    No.
22        Q.    Presenting uncontrollable behavior?
23        A.    No.
24        Q.    Damaging property?
25        A.    No.
```

1       Q.    Resisting orders in any way?

2       A.    No.

3       Q.    Posing any kind of threat to anyone?

4       A.    No.

5       Q.    Did -- and we talked about your

6    conversation with your superior about Mr. Hollins

7    already, right?

8       A.    Yes.

9       Q.    You don't recall any details about that

10   conversation?

11      A.    No.

12      Q.    You don't recall whether or not there --

13   aside from your conversation with your supervisor,

14   any other conversations about Mr. Hollins?

15      A.    No.

16      Q.    Now, at the time you placed Mr. Hollins in

17   the restraint chair, did you know that he had already

18   been in the restraint chair earlier that day?

19      A.    No.

20      Q.    No one told you?

21      A.    No.

22      Q.    Was it typical to put somebody in the

23   restraint chair twice?

24      A.    No.

25      Q.    That was unusual?

1    supervisor?
2        A.   No.
3        Q.   But it's your testimony that you would
4    have done so that day?
5        A.   I would have took him out of the chair if
6    I would have known, but I didn't know.
7             I'm a good officer.  I do my job and I
8    just do what I'm supposed to do and what I'm trained
9    to do.
10       Q.   Got you.
11            So if there was a rule against it, you
12   wouldn't have done something that violated the rule?
13       A.   What do you mean by that?
14       Q.   Well, you're talking about for the safety
15   of an individual, you wouldn't have put Mr. Hollins
16   in the restraint chair a second time?
17       A.   No.
18       Q.   You would not have?
19       A.   I would have not.
20       Q.   And is that because it would have been
21   dangerous to him?
22       A.   Yes.
23       Q.   Could have risked his health?
24       A.   Yes.
25       Q.   Could have risked his life?

```
1         Q.    Aside from the sheriff, supervisor, nurse,
2    do you recall anyone else coming in or coming out of
3    that room?
4         A.    No.
5         Q.    And when you were with Mr. Hollins, did
6    you perceive him to be a threat to you?
7         A.    No.
8         Q.    Threat to any of the officers?
9         A.    No.
10        Q.    Threat to anyone else?
11        A.    No.
12        Q.    Did he appear to be a threat to himself?
13        A.    No.
14        Q.    Did he try to damage any property?
15        A.    At the jail?
16        Q.    Yes.
17        A.    No.
18        Q.    But you have no personal knowledge about
19   him damaging other property; you didn't see anything?
20        A.    No.
21        Q.    Was Mr. Hollins disrespectful to you?
22        A.    No.
23        Q.    Was he disrespectful to anyone else?
24        A.    No.
25        Q.    How would you describe his demeanor when
```

1        inmate Hollins in handcuffs.
2               A.    Yes.
3               Q.    That's accurate?
4               A.    Yes.
5               Q.    Mr. Hollins sat in the chair willingly
6        without force; that's also accurate?
7               A.    Yes.
8               Q.    And you applied all the straps and secured
9        them?
10              A.    Yes.
11              Q.    And then it says -- and I'm just looking
12       at the narrative for a moment, after you placed those
13       straps, you then write, I escorted inmate Hollins to
14       the infirmary and placed him in the multi-purpose
15       room.
16                    Do you see that?
17              A.    Yes.
18              Q.    Does that refresh your recollection of
19       whether or not you placed him in the chair and
20       applied the straps and then moved him?
21              A.    No.
22              Q.    You don't recall?
23              A.    No.
24              Q.    But that's what this says?
25              A.    Right.

1    medically clear someone?
2         A.   To make sure they don't get hurt or they
3    blood flow don't stop.  The nurse's job is to make
4    sure they're safe.
5         Q.   From the chair?
6         A.   Yes.
7         Q.   Because the chair could be dangerous to an
8    individual?
9         A.   Yeah --
10             MR. SABZEVARI:  Object to the form.
11        Q.   (By Mr. Klorfein) Is that a yes?
12        A.   Yes.
13        Q.   Now, setting aside this document for a
14   moment, just talking about your tenure there for a
15   year.
16        A.   Okay.
17        Q.   The people that you had placed in the
18   restraint chair, not just this time, had a nurse ever
19   told you an individual is not medically cleared to
20   stay in the chair?
21        A.   I don't remember.
22        Q.   Do you recall one way or the other whether
23   or not a nurse ever said we cannot use the chair
24   because of health reasons?
25        A.   No.

Page 96

1    4:36 p.m., would you agree with me that that was
2    longer than four hours?
3            MR. SABZEVARI:  Object to the form.
4            You may answer.
5            THE WITNESS:  Can you repeat that
6       question?
7            MR. KLORFEIN:  Sure.  Let me break
8       it down.
9       Q.   (By Mr. Klorfein) You said at
10   approximately 11:39 hours, you put him in the chair;
11   that's in your report.
12       A.   Correct.
13       Q.   And I'm asking you, if there's a video
14   that shows him in the chair at 4:36 p.m., he was in
15   the chair for longer than four hours.
16       A.   Yes.
17       Q.   That's correct?
18       A.   Yes.
19       Q.   Down it says, Witnesses: Sergeant T.
20   Givens.  Do you see that?
21       A.   Yes.
22       Q.   Was Givens your supervisor?
23       A.   Yes.
24       Q.   Was Givens your supervisor at the time you
25   placed Mr. Hollins in the chair?

1  reviewing that, and let me know when you're ready.
2       A.   Okay.
3       Q.   You've had a chance to review it?
4       A.   Yes.
5       Q.   This is the Clayton County Sheriff's
6  Office policy for the inmate restraint chair while
7  you were employed there?
8       A.   Correct.
9       Q.   Is it a fair and accurate copy of that
10 doc- -- of that policy?
11      A.   I don't remember how it looked.
12      Q.   Doesn't appear -- does it appear to have
13 any issues with what you remember?
14      A.   No.
15      Q.   And you received the policy during the
16 normal course of your duties at the Clayton County
17 Sheriff's Office?
18      A.   Yes.
19      Q.   You were trained on this policy?
20      A.   Yes.
21      Q.   And you understood the policy when you
22 were employed there?
23      A.   Yes.
24      Q.   Were there any changes made to the policy
25 while you were employed?

Page 117

1    standard handcuffs and leg irons are removed.
2              Do you see that?
3         A.   You said B?
4         Q.   Still under subsection A.
5         A.   Okay.
6         Q.   That second full line beginning "This
7    requires," says, This requires that standard
8    handcuffs and leg irons are removed.
9              Do you see that?
10        A.   Yes.
11        Q.   And so it was the policy of Clayton County
12   Sheriff's Office to remove handcuffs prior to placing
13   the individual in the restraint chair?
14        A.   Correct.
15        Q.   You've already testified you did not
16   remove Mr. Hollins' handcuffs when placing
17   Mr. Hollins in the restraint chair?
18        A.   Correct.
19        Q.   So you violated this part of the policy?
20        A.   Correct.
21        Q.   Turning to the second page, Section B,
22   conditions for use, close to the top of the page.  Do
23   you see that?
24        A.   Yes.
25        Q.   And it says, under that Subsection B(1),

1     Officers may use the restraint chair for emergencies
2     in any or all the following situations.
3               Do you see that?
4         A.    Yes.
5         Q.    And so it outlines two situations where an
6     officer may use the restraint chair?
7         A.    Correct.
8         Q.    And so if neither of these situations
9     applies, the restraint chair should not be used?
10        A.    Correct.
11        Q.    And so Subsection 1(a) says, When an
12    inmate has demonstrated violent or uncontrollable
13    behavior.
14        A.    Correct.
15        Q.    Now, you already testified that you did
16    not observe any violent or uncontrollable behavior of
17    Mr. Hollins.
18        A.    Yes.
19        Q.    Subsection B says, To prevent inmate self
20    injury, injury to others, or property damage.
21              So you see that?
22        A.    Correct.
23        Q.    You already testified that when you
24    observed Mr. Hollins, he was not presenting any risk
25    of self injury, injury to others, or property damage?

1          A.    Yes.
2          Q.    So you violated this portion of the
3     policy, too?
4          A.    Correct.
5          Q.    Continuing down, under Section C,
6     application guidelines, do you see that?
7          A.    Yes.
8          Q.    Subsection 1 under that says, Application
9     will conform to the following guidelines.  It's the
10    middle of that paragraph.
11         A.    You said C?  Section C?
12         Q.    Section C(1).
13         A.    Oh, okay.
14         Q.    C says, Application Guidelines, right?
15         A.    Correct.
16         Q.    And then one under that lists the
17    paragraph.
18         A.    Right.
19         Q.    And says, Application will conform to the
20    following guidelines.
21         A.    Yes.
22         Q.    So the letters that go under this
23    paragraph are the guidelines that you were required
24    to abide by?
25               MR. SABZEVARI:  Object to the form.

Case 1:23-cv-05890-VMC   Document 122-4   Filed 09/19/25   Page 19 of 20
Jervarious Hargrove                                        October 21, 2024
Hollins, Chryshon v. Hill, Sheriff, Victor

Page 132

```
1         A.    Correct.
2         Q.    You'd agree with me that indicates it
3    could be dangerous?
4         A.    Yes.
5         Q.    And you knew that at the time you used it?
6         A.    Yes.
7         Q.    I am marking Plaintiff's Exhibit 7.
8               (Exhibit No. 7 was marked for
9         identification.)
10        Q.    (By Mr. Klorfein) For this next line of
11   questioning, I want to reiterate, I do not want to
12   ask any about -- anything about your conversations
13   with your attorney.  I just want to make that clear.
14        A.    Okay.
15        Q.    Do you remember reviewing discovery
16   responses and verifying that they were accurate under
17   oath?
18        A.    What is that?
19        Q.    Sure.
20        A.    Discovery responses.
21        Q.    Do you remember being asked questions in
22   this case in written form?
23        A.    No.
24        Q.    Well, take a look at this document.  Do
25   you recognize it?
```

1    Q.    All right.  It's my client, Chryshon
2    Hollins, position that he was harmed during the
3    incident that occurred on April -- around April 27th.
4    I just want to ask your basis to dispute this.  Do
5    you have any evidence to dispute the fact that he
6    believes he's now withdrawn as a result of this
7    incident?
8              MR. SABZEVARI:  Object to the form.
9              THE WITNESS:  Can you repeat that
10        question?
11             MR. KLORFEIN:  Sure.  Let me phrase
12        it a little bit differently.
13   Q.    (By Mr. Klorfein) My client claims he's
14   been harmed from this incident, referencing being
15   withdrawn, staying in his room, having trouble
16   looking people in the eye, having trouble holding
17   conversations, things like that.  Do you have any
18   evidence to dispute that assertion?
19   A.    No.
20   Q.    Aside from your attorneys, have you
21   discussed this lawsuit with anyone?
22   A.    My mom.
23   Q.    What have you told her about this lawsuit?
24   A.    That I got a dispute today, and I'm
25   nervous.